# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 7, 2011

## STATE OF TENNESSEE v. CHRISTOPHER MABRY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-03219      W. Mark Ward, Judge**

**No. W2010-01843-CCA-R3-CD  - Filed July 14, 2011**

A Shelby County Criminal Court jury convicted the appellant, Christopher Mabry, of aggravated assault, a Class C felony, and aggravated criminal trespass, a Class A misdemeanor.  After a sentencing hearing, the trial court sentenced him to consecutive sentences of four years and eleven months, twenty-nine days, respectively.  On appeal, the appellant contends that the evidence is insufficient to support the convictions.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Stephen Bush and Tony N. Brayton (on appeal) and Constance Barnes (at trial), Memphis, Tennessee, for the appellant, Christopher Mabry.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tracye Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that the Shelby County Grand Jury indicted the appellant for the aggravated robbery of Michael Biggs, the attempted aggravated robbery of Tonickia Burns, aggravated burglary, and employing a firearm during the commission of a felony.  At trial, Michael Biggs testified that on the night of October 15, 2008, he and his girlfriend, Tonickia

Burns,[1] were taking a bath in Burns's one-bedroom apartment in Memphis. Two children were sleeping in the bedroom. Biggs heard someone knocking at the door, went to the door with just a towel wrapped around him, and asked who was there. He said a man answered, "Fuzz." Biggs knew "Fuzz" and cracked open the door. He said Fuzz "was mumbling, so I thought that was kind of strange." He stated that seconds later, the appellant "busted into" the apartment and that Fuzz ran away. Biggs said the appellant, who was known as "Webay," had a rifle or shotgun and ordered him onto the floor. Biggs said he refused to get onto the floor because "I was too scared to move, really, but at the same time, I was just thinking like there's a girl and two kids, so if I lay down, they really ain't going to have no help, so I just, I just wasn't going to do it." Biggs said the appellant asked, "[W]here the money at, where's it at, I know it's in here." Biggs said that he told the appellant he did not have any money and that the appellant said, "[I]f I don't leave with no money, I'm killing everybody." Burns was standing in the bathroom doorway and was screaming. The appellant told her to give him the couple's cellular telephones so she could not call the police. Burns gave the appellant Biggs's telephone, and the appellant put the phone into his pocket. Biggs said that he "dove at" the appellant, that Burns telephoned the police, and that he and the appellant struggled over the gun for fifteen or twenty minutes.

Biggs testified that when the police arrived, they found him and the appellant in the children's bedroom, still struggling over the gun. The police ordered the appellant to release the gun and told him they were going to open fire if he did not let go. The appellant released the weapon. Biggs said that he told the police the appellant had taken his Blackberry phone and that the police "went back out there to the car and got my phone and brought it back to me." He acknowledged that he had two prior felony convictions, one for aggravated robbery and one for failure to appear. He said that he no longer had any contact with Burns and that he did not think she still lived in Memphis.

On cross-examination, Biggs acknowledged that the apartment belonged to Burns and that she was the only person named on the lease. He also acknowledged that the appellant did not take any property off his person and that he did not give any property to the appellant. He said that he had known Fuzz for two to three months at the time of the robbery, that he had never seen the appellant before, and that he answered the door because "they were beating so hard I wanted to see who it was." After the incident, the police returned his telephone to him; they did not keep it or photograph it. He denied selling drugs to Fuzz and the appellant or short-changing the appellant during a drug buy. He said that he did not hide drugs in the apartment and that the police searched the apartment. He said he was six feet, three inches tall and weighed two hundred fifty pounds. He acknowledged that the appellant

_____

[1]In the trial transcript, Burns's first name is "Tomikia." However, we have chosen to use her name as it appears in the indictments.

was about five feet, eight inches tall and weighed one hundred sixty pounds. He said that although the appellant was smaller than he, the appellant "held onto that gun. He never let it go." He acknowledged that during the struggle over the gun, his finger was on the trigger and he was in the position to fire it.

Officer Levy Leon of the Memphis Police Department testified that on October 15, 2008, he was on patrol and heard a call over the police radio. Officer Leon was only one-half block away from Burns's apartment and drove to the apartment complex. He said that he saw a woman running toward his police car, that she had a towel covering "her top part," and that she was in a panic. The woman was screaming, holding a cellular telephone, and said, "[H]e's in there, he's fighting with my husband, they're fighting over the gun." Officer Leon called for backup. Another officer arrived, and they went into the apartment. They checked the living room and the kitchen; walked down a hallway; and found Biggs and the appellant in a bedroom, fighting over a shotgun. Officer Leon drew his weapon and ordered the appellant to drop the gun. He said that the appellant was wearing a purple bandana around his neck, a white t-shirt, and jeans; that Biggs was wearing only a dark towel or shorts; and that "I immediately knew who the suspect was." The appellant let go of the gun with one hand, pulled the bandana onto his face with his other hand, and resumed struggling over the gun with Biggs. Officer Leon kept ordering the appellant to release the gun, and the appellant finally let go and raised his hands. Officer Leon grabbed the appellant by his shirt, put him onto the floor, and handcuffed him. Officer Leon said the shotgun was loaded with one round in the chamber.

On cross-examination, Officer Leon testified that he searched the apartment for another suspect but that he did not search the apartment for any other evidence. He did not search the apartment after the appellant's arrest. He said that when he discovered the appellant and Biggs struggling over the gun, the men were standing. The appellant let go of the gun before Biggs. After Officer Leon arrested the appellant, he patted down the appellant but did not find a cellular telephone. He said that he did not take the appellant to The Med for medical treatment and that "I don't know about that."

Officer Steven Grigsby of the Memphis Police Department testified that he took custody of the evidence in this case on October 15. The evidence included a weapon, a blue bandana, and two shotgun shells. On cross-examination, Officer Grigsby testified that he was not one of the first responding officers and did not see the appellant at the scene. He said that other officers brought the evidence to him and that he may have "tagged" a cellular telephone but was not certain.

Officer Gary Badgett of the Memphis Police Department testified that about 12:15 p.m. on October 16, 2008, the appellant signed a waiver of rights form and gave a statement.

In the statement, the appellant said the following: The appellant went to the apartment with someone he knew only as "Fuzz" in order to rob Biggs of "dro," marijuana. During the robbery, Biggs gave the marijuana to the appellant. Burns opened the bathroom door and started screaming, and the appellant told her to give him the telephones. Burns dropped the telephones, Biggs "rushed" the appellant, and they struggled over the gun. When the police arrived, they told the appellant to drop the weapon and began to "stomp" him. The appellant was armed during the robbery but did not take or receive anything.

On cross-examination, Officer Badgett acknowledged that the appellant received treatment at The Med before he gave his statement. Officer Badgett did not request fingerprint analysis on the gun or shotgun shells.

The appellant testified on his own behalf that on October 15, 2008, he went to Burns's apartment to buy marijuana from Biggs. He paid Biggs fifty dollars and should have received two grams of marijuana. He said that when he got home, he discovered Biggs had "shorted" him about one-half gram. The appellant telephoned Biggs, but Biggs did not answer, so the appellant telephoned Fuzz. The appellant and Fuzz went to the apartment. Fuzz had a shotgun and told the appellant he was going to rob Biggs. Fuzz knocked on the apartment door, Biggs answered the door, and the appellant and Fuzz went inside. The appellant said that Biggs saw Fuzz holding the gun and that Biggs "rushed" them. The gun fell onto the floor, Fuzz ran away, and the appellant and Biggs reached for the gun. The appellant said he tried to get the gun because he did not want Biggs to shoot him.

The appellant testified that a woman came into the room and started screaming. Biggs told her to get a knife, and she returned with a butcher knife. She tried to stab the appellant, but he kicked at her. When the police arrived, they ordered the appellant to let go of the gun. The appellant let go immediately and put his hands up. While he was lying on the floor, the police began stomping him. He said that he never had possession of Biggs's Blackberry, that he did not take anything from Burns or Biggs, and that the police searched his pockets. He said that during his struggle with Biggs, he dropped his marijuana. He acknowledged that his marijuana should have been somewhere in Burns's living room. He told the police Biggs was selling drugs out of the apartment. However, the police did not write that in his statement. He said that when he and Fuzz entered the apartment, he never got a chance to ask Biggs about his missing marijuana. He said that he told the truth in his statement but claimed that he did not tell the police he participated in the robbery or that he told Burns to give him the telephones.

On cross-examination, the appellant acknowledged that in May 2008, he pled guilty to manufacturing, delivering, and selling a controlled substance. He also acknowledged that Fuzz was indicted with him in this case. He said that he met Biggs through Fuzz and that he

asked Fuzz to return to the apartment with him on the night of October 15 because he thought Fuzz would speak up for him. He acknowledged that he knew Fuzz was going to rob Biggs. However, he said he did not want any part of the robbery and only went to the apartment "[t]o get what was mine." He said he was able to fight off Biggs and Burns because "it's life or death situation. I'm feeling they can kill me, so my adrenaline pumped." He acknowledged that in his statement to the police, he did not mention that he bought marijuana from Biggs earlier or that Burns had a butcher knife. He said that he had just come from The Med when he gave his statement, that he was "beat up," and that he was "kind of throwed off." He also said that he was in pain when he gave his statement, that he was "just ready to get this over with," and that he was not "functioning right." He acknowledged that parts of his statement were true and that he signed his statement.

On redirect examination, the appellant testified that a scale was in the apartment and that he was going to use the scale to show Biggs he had not received all of the marijuana he paid for. He said his statement to police did not contain everything he told them.

The appellant was indicted for the following offenses: count 1, aggravated robbery with a deadly weapon of Biggs; count 2, attempted aggravated robbery of Burns; count 3, aggravated burglary; and count 4, employing a firearm during the commission of a felony. The jury convicted him of the lesser-included offenses of aggravated assault in count 1 and aggravated criminal trespass in count 3. The jury acquitted him of counts 2 and 4.

## II. Analysis

The appellant claims that the evidence is insufficient to support the convictions. Regarding his aggravated assault conviction, the appellant argues that the evidence is insufficient because no physical evidence, such as fingerprints or a cellular telephone, exists to support Biggs's version of events. Regarding the aggravated criminal trespass conviction, the appellant argues that the evidence is insufficient because the proof fails to show he did not have Burns's effective consent to enter the apartment. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual

issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated assault, as a lesser-included offense of aggravated robbery with a deadly weapon, occurs when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(B). Assault occurs when a person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). Aggravated criminal trespass, as a lesser-included offense of aggravated burglary, occurs when a person

> (1) The person knows the person does not have the property owner's effective consent to do so; and
>
> (2) The person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another.

Tenn. Code Ann. § 39-14-406(a).

Initially, we note that the State contends this court should dismiss the appellant's appeal because his motion for new trial was untimely. However, as this court has repeatedly stated, "If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997)). Thus, we will address the appellant's sufficiency of the evidence claim.

Taken in the light most favorable to the State, the evidence shows that when Biggs answered the door, the appellant forced his way into the apartment. The appellant had a shotgun, ordered Biggs onto the floor, and demanded money. Biggs refused to get onto the floor because he was scared and because he was afraid for his girlfriend and the children. When the police entered the apartment, they found Biggs struggling over the gun with the

appellant. Although Biggs claimed the appellant took his Blackberry phone, Officer Leon testified that he searched the appellant after the arrest and did not find a phone. The jury, concluding that the State failed to prove the appellant took Biggs's property, nevertheless found the appellant guilty of the lesser-included offense of aggravated assault. The evidence is sufficient to support that conviction.

Regarding the appellant's conviction for aggravated criminal trespass, the appellant contends that the evidence is insufficient because Burns, who was the "owner" of the apartment, failed to testify regarding her consent for him to enter and remain in the apartment. However, Biggs testified that the appellant forced his way into the apartment with a gun. At some point, Burns appeared in the bathroom doorway and started screaming. While Biggs and the appellant struggled over the weapon, Burns telephoned the police and ran outside. Officer Leon testified that when he arrived at the apartment complex, Burns ran toward him. She was screaming and in a panic. She told him the appellant and Biggs were in the apartment and fighting over the gun. Although Burns did not testify at trial, the jury could reasonably conclude from Biggs's and Officer Leon's testimony that the appellant did not have Burns's effective consent to enter and/or remain in the apartment. Therefore, taken in the light most favorable to the State, the evidence is sufficient to support the conviction.

### III. Concluison

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-7-